[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This suit was initiated by writ, summons and complaint dated January 16, 1991, and returnable on the first Tuesday of February, 1991. Plaintiff, George F. Sherman seeks damages for breach of contract as concerns a certain written agreement dated June 26, 1986. The agreement pertains to the granting of slope rights and the performance of certain improvements on the plaintiffs' premises in consideration thereof. CT Page 4662
The complaint seeks money damages, attorney's fees, costs and expenses.
The defendant, William D. Corkhill, appeared by counsel on February 14, 1991.
The defendant, R. Woodrow Scott, appeared by counsel on February 19, 1991.
On December 3, 1991, R. Woodrow Scott and Scotts Orchards, Inc. filed an Answer to the complaint.
No appearance has ever been filed for Scotts Orchards, Inc.
On December 2, 1991, a Cross Complaint was filed by the defendants R. Woodrow Scott and Scotts Orchards, Inc. against the cross defendant William D. Corkhill and against Stephen Corkhill, an individual, not a defendant in Sherman's original Complaint. The non-complainants seek indemnification in the event a judgment should enter against R. Woodrow Scott or Scotts Orchard, Inc.
On December 4, 1991, an Answer was filed by the defendant William D. Corkhill to the original Complaint by Sherman.
On August 17, 1994, the plaintiff was nonsuited, but on September 12, 1994, a Motion to Reopen was granted.
An Answer by the defendant William D. Corkhill to the Cross Complaint dated December 3, 1991 was filed on March 14, 1995 with the court. The court treats the Answer of December 3, 1991, and the Cross Complaint of December 3, 1991 by Scotts Orchards, Inc. as equivalent to an appearance.
The court makes the following findings of fact.
George and Barbara Sherman are now, and have been for some time, the owners of premises known as 72 Lovers Lane, East Lyme, Connecticut.
Prior to June, 1986, George Sherman's former wife, Louise Sherman, resided in the Lovers Lane residence, and in June, 1986, George Sherman resided in Groton. CT Page 4663
George Sherman was, for many years, a senior draftsman employed by Electric Boat in Groton. Sometime during the period of 1972 and 1974, George Sherman was divorced from Louise Sherman.
Incident to the dissolution of that marriage, Louise Sherman conveyed her interest in and to the 72 Lovers Lane premises to George Sherman on January 31, 1974. [See Defendants' Exhibit #18.]
During the period 1974 to 1986, notwithstanding the transfer of title to George Sherman, the former spouse Louise Sherman and a daughter of that union occupied the 72 Lovers Lane premises.
Robert Woodrow Scott is a resident of East Lyme. Scott has lived in East Lyme in the home in which he was born for 78.5 years. Scott is a fruit and vegetable farmer and sometime developer.
Scott, along with his father and a brother, formed a corporation which was known as Scotts Orchard, Inc.
Scott subsequently acquired the shares of his father and brother in the corporation, both having passed away.
The corporation, Scotts Orchards, Inc. was dissolved in August, 1991.
Prior to March, 1986, Scotts Orchards, Inc. held an option from Mabel C. Lamb, whereby it could acquire a certain tract of land bounded, in part, by Lovers Lane.
On March 4, 1986, Scotts Orchards, Inc. exercised the above noted option and acquired title to said tract. [See Defendants' Exhibit #29.]
The consideration for this purchase was $100,000.00.
In March, 1986, Scott met with Louise Sherman, then still a resident of 72 Lovers Lane. Under the impression that Louise Sherman was the owner, Scott, inquired as to acquiring certain slope rights on the Sherman property, incident to the proposed development of the newly acquired tract. CT Page 4664
Although not in form suitable for recording on the land records, Louise Sherman executed two writings granting permission for the slope rights on the Sherman premises. [See Defendants' Exhibit #14 and #15.]
Scotts Orchards, Inc. paid Louise Sherman $500.00 in cash for the slope rights.
Scott subsequently determined that Louise Sherman was not a record title holder of the premises and, therefore, she could not legally grant the requested slope rights.
Soon after March 18, 1986, on the basis of the foregoing, Scott called George Sherman and asked for a meeting with him in Groton, having learned that George Sherman was the owner of record. On or about April 1, 1986, a meeting between Scott, George Sherman and Stephen Corkhill took place in Groton at Sherman's residence. The purpose of the meeting was to discuss the acquisition of slope rights on the Sherman property incident to the proposed development of the tract acquired by Scotts Orchards, Inc. from Lamb. This meeting was short. Its purpose was stated by Scott, who introduced himself as well as Stephen Corkhill to Sherman, and it was agreed to meet again in two weeks at Sherman's home.
At the second meeting at Sherman's home in Groton, there was a discussion of the proposed development of the newly acquired tract. Sherman was not happy about the development as he felt it would lessen the tranquility of the area where his home was situated.
At this second meeting Scott indicated to George Sherman in general terms the nature of the intended development, that everything that was contemplated should be made known to Stephen Corkhill inasmuch as Stephen Corkhill and William D. Corkhill were to be the actual physical developers of the tract.
This second meeting was the last face to face meeting between Scott and George Sherman until after suit was brought. On or about February 26, 1986, a real estate contract between R. Woodrow Scott and William D. Corkhill was executed whereby William D. Corkhill would acquire the subject tract of land for and in consideration of $140,000.00. [See Defendants' Exhibit #17.] This contract was contingent on Scott securing CT Page 4665 subdivision approval from the East Lyme Planning Commission.
On June 26, 1986, there was a meeting at the office of Attorney Palm in Groton.
Present were Scott, Stephen Corkhill and Nancy Corkhill, Attorney Palm's and members of Palm's staff. A document on counsel's letterhead was presented at this meeting. [See Plaintiffs' Exhibit #1.] The document had been prepared by counsel for Sherman.
According to George Sherman, Attorney Palm was representing the Shermans. George Sherman testified to this effect on several occasions during the trial and the court so finds.
On June 17, 1986, George F. Sherman conveyed the title to 72 Lovers Lane to himself and Barbara Sherman, his then spouse. [See Defendants' Exhibit #19.]
Plaintiff's Exhibit #1 purports to be an agreement between George F. Sherman and Barbara F. Sherman, R. Woodrow Scott and Stephen Corkhill concerning the performance of certain work on the Sherman's property, in consideration of the signing of "Grant of Slope Rights dated June 26, 1986" said work to be done by Scott and Corkhill.
The principals signing Plaintiff's Exhibit #1 were Douglas Corkhill and R. Woodrow Scott.
The agreement purports to involve Stephen Corkhill who signed the document as a witness and not as a principal as set forth in the typed portion of the document. The agreement was signed by R. Woodrow Scott apparently as an individual rather than as an authorized corporate officer of Scotts Orchards, Inc., the then owner of record of the subject tract.
The agreement refers to certain slope rights which were granted on June 26, 1986, which is inaccurate, said slope rights not being granted until July 12, 1986, [see Plaintiffs' Exhibit #2] wherein the slope rights were granted to Scotts Orchards, Inc.
The agreement [Plaintiffs' Exhibit #1] refers to "attached informal sketches" which were not present nor in CT Page 4666 existence at the time the signatures were affixed. [See Plaintiffs' Exhibit #1A.]
Scott never saw the "sketches" [Plaintiffs' Exhibit 1A] until 1991 when this lawsuit was commenced.
George and Barbara Sherman were not present at Attorney Palm's office on June 26, 1986, although he was their counsel and had prepared the document for them.
Plaintiffs' Exhibit 1A was prepared by George Sherman who was a senior draftsman at Electric Boat and consists of six pages of detailed drawings precisely to scale in part covering a wide range of anticipated improvements on Sherman's property. Without Plaintiffs' Exhibit 1A which was not in existence on June 26, 1986, Plaintiffs' Exhibit 1 lacks specificity, identification and detail and is vague aside from other infirmities.
On June 3, 1986, the East Lyme Planning Commission gave its approval to Scotts Orchards, Inc. for the proposed 14 lot subdivision located on Lovers Lane. [See Defendants' Exhibit #30.]
This approval required acceptable slope rights from Sherman and another owner across the way named Banta.
Scotts Orchards, Inc. conveyed the subject tract to William Douglas Corkhill only on July 23, 1986. [See Defendants' Exhibit #16.]
This was about one month after the June 26, 1986 date on Plaintiffs' Exhibit #1 at which time Douglas Corkhill was neither an owner of any affected real estate nor referred to as a principal in the document. [Plaintiffs' Exhibit #1.]
Douglas Corkhill took title to the subject tract alone because he was in a financial position to do so.
Neither Stephen or Douglas Corkhill ever represented that they or either of them were agents or employees of Scotts Orchards, Inc.
Scott had served in the past for 16 years on the East Lyme Planning Commission. CT Page 4667
After conveyance of Scotts Orchards, Inc. to William D. Corkhill, [Defendants' Exhibit #16, dated July 23, 1986] Scott never set foot on the tract, on Sherman's property or committed any trespass thereon and never heard from Sherman until suit was brought.
Scott never agreed to the detailed scale drawings of Sherman as reflected in Plaintiffs' Exhibit #1A.
Stephen Corkhill is a self-employed builder and resides on Jean Drive in the subdivision created on the subject tract.
Stephen Corkhill was with Scott when Scott first met George Sherman in February or March of 1986. Stephen Corkhill was with Scott when Scott paid Louise Sherman $500.00. Stephen Corkhill accompanied Scott on both meetings with George Sherman in Groton.
At George Sherman's request, Stephen Corkhill, working with his brother William D. Corkhill, incident to the development of the subdivision, took down several large trees that were near the Sherman residence and Corkhill paid for the cost of this removal.
Incident to the tree removal, which required heavy equipment, some tire marks were left on Sherman's property which angered Sherman, as a result, Stephen Corkhill was told not to set foot on Sherman's premises. McKay Engineering of Niantic prepared drawings of the required slope rights concerning Jean Drive, the roadway serving said subdivision. [See Plaintiffs' Exhibit #11] as well as the cluster development plans of the subdivision, [see Plaintiffs' Exhibit 10] McClure was engaged to do the actual roadway installation.
After a dispute between George Sherman and McClure concerning the installation of a new water line service into the Sherman residence, the Corkhills paid for said installation to try and please Sherman although there was no obligation for them to do so.
William D. Corkhill has been a self-employed developer and builder for 25 years. William D. Corkhill is familiar with the procedures involving getting planning approval. He has constructed roads, can read plans, and has on occasion CT Page 4668 been involved in subdivisions with his brother Stephen Corkhill.
In the subject tract, William Corkhill was the sole owner developer. William Corkhill was willing to pay Scott $40,000.00 over what Scott had paid for the tract because Scott would be required to secure all necessary subdivision approvals. William Corkhill never discussed Plaintiffs' Exhibit #1 with Attorney Palm. Attorney Palm did not represent William Corkhill as concerns the document Plaintiffs' Exhibit #1. William Corkhill never agreed to perform the work shown on Plaintiffs' Exhibit #1A (the sketches).
Incident to the development of the tract, the Town Engineer Mr. Thumb raised the level of Jean Drive, that request having come from Mr. Banta. The town engineer is the ultimate authority as to the determination of the road level for purposes of acceptance of the road by the Town. When McClure or his designee installed the new water service from the roadway into the Sherman residence, William Corkhill paid $1,000.00 for the same.
In order to try and please George Sherman after the required sloping had been done on Sherman's property, William Corkhill, at Sherman's request, hired Rix, a person who had done work for Sherman in the past, to do the finish grading and seeding, all of which was paid for by William Corkhill.
When the level of Jean Drive roadway was raised by Town Engineer Thumb, any necessity for the erection of any retaining wall along Jean Drive was eliminated and if, in fact, installed in accordance with the original highway layout would have ended up being buried.
At the time of the claimed cutting of certain trees in the rear of the Sherman residence, George Sherman was not a resident of 72 Lovers Lane, and cannot say who may have cut any trees. George Sherman claimed at least 30 trees were wrongfully cut.
Barbara Sherman was present in 1986 when her spouse George Sherman first met Scott and Stephen Corkhill. Barbara Sherman dropped off the sketches, [Plaintiffs' Exhibit #1A] at Attorney Palm's office on June 30, 1986. CT Page 4669
Barbara Sherman felt that Plaintiffs' Exhibit #1 had been prepared by Attorney Palm on Sherman's behalf and on Sherman's instructions.
The sloping work on the Sherman premises was done before George Sherman and Barbara Sherman moved into the 72 Lovers Lane premises in October or November, 1986.
The sketches and drawings comprising Plaintiffs' Exhibit #1A were never signed or initialed by either Sherman or Scott or William D. Corkhill. The sketches [Plaintiffs' Exhibit #1A] could not have been reviewed by William D. Corkhill at the time he was alleged to have signed Plaintiffs' Exhibit #1, the supposed contract, because the sketches were not in existence at that time. George Sherman had never met nor spoken to William D. Corkhill prior to June 30, 1986.
Plaintiffs' Exhibit #1, the document prepared by Attorney Palm for Sherman was never signed or initialed by Sherman.
Frederick G. Thumb is employed by the Town of East Lyme, Department of Public Works and has been so employed since 1986 as town engineer. Mr. Thumb was previously employed as a civil engineer by the State of Connecticut for 9 years. Mr. Thumb graduated from Worcester Poly-Tech with a degree in civil engineering.
In 1986, Mr. Thumb was the town engineer and was in charge of the supervision of the construction of Jean Drive and he was on the site almost on a daily basis.
Mr. Thumb testified, and the court finds, that the subdivision was approved by the Town of East Lyme and the preliminary plans were approved by the former town engineer, James Spencer, and the Town of East Lyme's Planning Commission.
Mr. Thumb testified, and the court finds, it is not unusual for road layouts to be changed during the course of construction and that the level of the roadways may be altered by his decision in the field if conditions warrant.
Mr. Thumb further testified, and the court finds, he was contacted by the adjacent property owner, Mr. Banta, when the CT Page 4670 roadway was cut in, asking if the roadway could be raised since there was such a severe cut along his property.
Mr. Thumb testified, and the court finds, that he, Thumb, reviewed the situation, determined that the road elevation could be changed and that the higher road level would create a better and safer situation for the road known as Jean Drive, the tract being developed.
Mr. Thumb testified, and the court finds, that the sight line along Lovers Lane would be improved when the elevation of the Jean Drive road was raised.
Mr. Thumb testified, and the court finds, that when the elevation of Jean Drive was raised, it eliminated the necessity to build a retaining wall along the property of the plaintiff Mr. Sherman.
Mr. Thumb testified, and the court finds, that the road was built to Town standards and specifications.
Mr. Thumb testified, and the court finds, that an additional curb cut was allowed along Jean Drive to service an additional contemplated driveway at the Sherman home.
Raising the level of Jean Drive constituted an improvement and advanced safety factors for vehicular traffic.
Mr. Thumb testified, and the court finds, that the road known as Jean Drive was completed and accepted by the Town of East Lyme and deeded to the Town. All requirements had been completed including seeding, topsoiling and grading of the shoulder areas of the roadway.
Mr. Eric Greenstein is a licensed real estate person who is familiar with property values in the Town of East Lyme.
The construction of the subdivision and the road way, known as Jean Drive, did not adversely affect Mr. Sherman's property.
Property values in the new subdivision have sold for twice the value of Mr. Sherman's property and have increased the value of Mr. Sherman's property. CT Page 4671
The doctrine of progression comes into play whereby the home with a lower value is increased and enhanced when it is located near homes of a higher value.
The sloping along Jean Drive did not affect, in a detrimental way, the value of Mr. Sherman's property.
Eric Greenstein testified, and the court finds, that the value of the Sherman property increased incident to the installation of Jean Drive. [See Defendants' Photographic Exhibits Nos. 7, 11, 12 and 34.]
This is an action brought to enforce an alleged contract for the improvement of real property owned by the plaintiffs. The defendants in the primary action are Scotts Orchards, Inc., Woodrow Scott and William D. Corkhill. There is also a cross complaint filed by Woodrow Scott against William D. Corkhill on what amounts to be an indemnification theory.
Testimony revealed that at the relevant point in time, Scotts Orchards, Inc. had an option on a parcel of land located in the Town of East Lyme, which was the subject of a subdivision application. The defendant R. Woodrow Scott was a principal of this Corporation, and in his individual capacity, contracted to sell this parcel to William D. Corkhill and Stephen Corkhill, which contract was contingent upon subdivision approval. Ultimately the property was conveyed by Scotts Orchards, Inc. to William D. Corkhill on July 23, 1986, together with relevant easements and rights. At issue is a document alleged by the plaintiff to obligate the defendant William D. Corkhill to make substantial improvements to plaintiffs' land. It is further alleged that this "contract" is evidenced by a certain letter agreement dated June 26, 1986 [Plaintiffs' Exhibit #1], together with various sketches dated June 30, 1986 [Plaintiffs' Exhibit #1A].
A fair summary of the testimony reveals the following with respect to the alleged contract: R. Woodrow Scott and/or Scotts Orchards, Inc., based on the original subdivision design, required the right to slope the portion of the land owned by Mr. Sherman in order to maintain town required grades to the new proposed road which would border his property. This approval was needed in order to obtain final subdivision approval in conjunction with the ongoing application before CT Page 4672 the East Lyme Planning Commission.
Mr. Scott had approached Mrs. Louise Sherman with respect to this request, and had received a writing from her agreeing to slope rights and, in fact, paid Mrs. Sherman money in conjunction with this letter. Subsequently, Mr. Scott determined George Sherman owned the property, and it was in conjunction with verbal discussions between Mr. Scott, Stephen Corkhill and George and Barbara Sherman that Attorney Palm prepared the document marked as Plaintiffs' Exhibit #1.
The testimony revealed that this document was prepared by Mr. Frederick Palm, Jr. who, to the parties understanding, was representing the Shermans. The testimony further revealed that at the time the document was executed by William Douglas Corkhill, there were no sketches attached to it, nor did William D. Corkhill ever meet with Mr. or Mrs. Sherman, nor discuss with them any of the work which was alleged to be required pursuant to the writing. The obtaining of slope rights was an obligation of Mr. Scott as it was required in order to obtain the subdivision approval. Mr. William D. Corkhill testified that at the time he signed the memorandum prepared by Mr. Palm, it was his understanding that it was a memorandum which required him to make relevant repairs to any areas which may have to be disturbed in conjunction with the installation of a new roadway and the widening of Lovers Lane.
The testimony also revealed that the sketches, which were contained as part of Plaintiffs' Exhibit #1A, were not in existence at the time the memorandum was executed by Mr. William Corkhill or Mr. Scott, but were prepared subsequently by Sherman.
Testimony also revealed that at the time the road was constructed in front of the plaintiffs' house, the town engineer, Frederick Thumb, changed the road design to elevate the road an additional five (5) feet, which significantly reduced and/or eliminated most of the sloping which had originally been contemplated. This change in design was not contemplated at the time the memorandum was executed.
The alleged contract, [Plaintiffs' Exhibit #1] which is the basis for the Plaintiffs' action, is unenforceable as there was no meeting of the minds on the part of the parties. CT Page 4673
 In order for an enforceable contract to exist, the court must find that the parties' minds had truly met. . . If there has been a misunderstanding between the parties, or a misapprehension by one or both so that their minds have never met, no contract has been entered into by them and the court will not make for them a contract which they themselves did not make' [A]n agreement must be definite and certain as to its terms and requirements.' (Citations omitted; internal quotation marks omitted). Fortier v. Newington Group, Inc., et al, 30 Conn. App. 505, 510, 620 A.2d 1321 (1993).
As has been earlier indicated, portions of the alleged agreement were not even in existence at the time the document was executed by Mr. William D. Corkhill. Moreover, Mr. William Corkhill was not aware that the detailed and elaborate sketches [Plaintiffs' Exhibit #1A] were to be prepared, nor did he ever see them until a much later date. There was testimony by Mr. William D. Corkhill that the writing represented a covenant on his part during the construction phase of the subdivision to repair whatever damage he may have caused in conjunction with this process. Mr. William Corkhill never envisioned an obligation on his part which in essence would have him practically relandscaping Mr. Sherman's entire yard. Indeed the extent of the claimed damages, in light of William D. Corkhill's alternative of constructing a small retaining wall on Town property in and of itself belies any rational consideration being given to this interpretation of the alleged contract. Mr. William D. Corkhill testified that it would have cost in a range of four or five thousand dollars to construct a retaining wall on Town property in order to eliminate all sloping rights for Mr. Sherman. When this is contrasted with a claimed forty thousand dollars in actual damages by Mr. Sherman, rationality belies Mr. William D. Corkhill's contracting for something which could have been accomplished in an alternative fashion, at roughly one-tenth of the cost.
The plaintiffs argue that the sketches were incorporated into the contract by the reference on Plaintiffs' Exhibit #1 to the language "see informal sketches." It is:
 [a] basic principle of contract law that parties to a contract may incorporate into their agreement the CT Page 4674 terms and conditions of another document by reference, so that the two will be interpreted together as the agreement of the parties. Housing Authority v. McKenzie, 36 Conn. Sup. 515, 518, 412 A.2d 1143 (1979).
However, the validity of such incorporation depends upon whether there was mutual assent to its terms. Courts have noted that,
 [T]he critical concern in determining the validity of the terms of a document incorporated by reference is whether the contracting parties knew of and assented to the additional provisions. This meeting of the minds and mutuality of assent are the most basic ingredients of a contract. Hence, the courts, while willing to enforce incorporated terms, will do so only when the whole writing and the circumstances surrounding its making evidence the parties' knowledge of and assent to each term. Id. 518-519.
There has been clear evidence on the part of all parties, that the sketches were not in existence at the time of the alleged contract, nor had Mr. William D. Corkhill ever seen them until a much later date. Thus, there could not possibly have been any assent by Mr. William D. Corkhill to the terms of these sketches, inasmuch as he had no knowledge of them. If the plaintiffs' position is maintained, Mr. Sherman would be left unfettered to create whatever elaborate obligations on the part of the defendants he desired, inasmuch as it was he who prepared the sketches.
Thus, even when an agreement contains all the essential elements of a contract, but further binds the parties to terms to be established by one of them, "the critical elements of knowledge of, and assent to, the additional terms will be missing." Id., at 519. "[W]here the added terms, established by one of the parties, modify or contradict a material term of the original valid contract, the incorporated terms must fall." Id., at 519. In this particular instance, even the original alleged contract is so indefinite as to negate any enforceable contract; nevertheless, even if it were to be found that a contract existed, clearly the supplemental sketches, having never been assented to by the obligor, must CT Page 4675 fall.
The essence of the claimed agreement is that in return for the conveyance of an easement (slope rights) by the plaintiff, the defendants were to accomplish some work on the plaintiffs' real property-in essence to pay for the conveyance of an interest in real property by work in lieu of money. Section 52-550 of the Connecticut General Statutes[1] requires such a contract to be in writing to be enforceable. Such a writing must be definite in its terms or the writing will be deemed insufficient. An option which fails to adequately describe an exempted portion of the option property is not sufficiently definite. See Montanaro Brothers v. Snow,190 Conn. 481, 460 A.2d 1297 (1983). In similar fashion, since the writing inadequately describes any mutual understanding of the parties, it too would fail to satisfy the statute of Frauds.
The lack of mutual assent would also preclude a claim that part performance would avoid the imposition of the statute. In order to take a contract out of the statute, part performance must be,
 referable to and consistent with [an] oral agreement between the parties. In the absence of an underlying agreement, there is no basis for finding that the party seeking enforcement, in reasonable reliance on the contract and on the continuing assent of the party against whom enforcement is sought, has so changed his position that injustice can be avoided only by specific enforcement." Id. 487. (Citations omitted; internal quotations omitted; emphasis in original.)
Thus, if there was no mutual assent even part performance would not render an oral contract enforceable. Hence, the same lack of mutual assent which precludes the finding of an enforceable written contract also precludes the enforcement of an alleged oral agreement.
At the time Plaintiffs' Exhibit #1 was executed, the defendant William D. Corkhill's only interest in the premises was pursuant to a contract where he and Stephen Corkhill had agreed to purchase the property from R. Woodrow Scott, which purchase was subject to subdivision approval. [See CT Page 4676 Defendants' Exhibit #17.] This agreement was clearly contingent upon the seller's obtaining subdivision approval, and testimony revealed that these slope rights were required in order to obtain such approval. It was contemplated by the parties at the time that Mr. William D. Corkhill, upon closing of the property, would complete the subdivision improvements. It was in conjunction with this construction phase that Mr. William D. Corkhill understood he was executing a document, the substance of which was that he would repair any damage to the property which was occasioned by the anticipated construction. This is far different from the allegations of the plaintiff that the work was in essence the price of obtaining the slope rights. If the rationale is that Mr. William D. Corkhill promised to pay for obtaining these slope rights, there is no consideration flowing to Mr. William Corkhill with respect to this and, as such, with respect to Mr. William D. Corkhill, this document must also fail for lack of consideration.
The foundation stone for the argument that there was a contract must of necessity rest on Plaintiffs' Exhibit #1 and if the rationale of incorporation by reference is resorted to then Plaintiffs' Exhibit #1A.
What does Plaintiffs' Exhibit #1 say
 1. "replace retaining walls." What retaining walls? They are not described in Plaintiffs' Exhibit #1 as to location, physical characteristics, composition, length, breath, etc.
 2. "resurface the driveway, including the added area, driveway to be widened and repaired." Is this the driveway shown in photographic exhibits, Defendants' Exhibits Nos. 2, 3, 4, 5 and 36? Or is it what is shown in Plaintiffs' Exhibit #1A which was not in existence when Plaintiffs' Exhibit #1 was signed?
 3. "remove existing stairs in front of house and replace with new ones." None of the photographic exhibits show the front steps. Is this a reference to what is shown on Plaintiffs' Exhibit #1A?
4. "install new steps on newly graded area." No CT Page 4677 location, dimensions, specifications, type of material unless resort is made to Plaintiffs' Exhibit #1A.
 5. "replace trees which have been removed." What trees? Location, size, species?
 6. "install a privacy barrier of _____." Where, location, type, size, length.
None of the above can be clearly defined without resort to Plaintiffs' Exhibit #1A which was not created nor attached to Plaintiffs' Exhibit #1 when signed, notwithstanding the reference on Exhibit #1 "see attached informal sketches" and Plaintiffs' Exhibit #1 was prepared by Plaintiffs' counsel.
Neither defendant Scott nor any representative of his corporation did any work on or about the subdivision known as Jean Drive after the conveyance of title to defendant Corkhill and in particular the property of the plaintiffs.
Neither defendant Scott nor Stephen Corkhill nor defendant William Corkhill ever made a separate oral promise to the plaintiffs to build the designed retaining wall along Jean Drive.
Neither defendant Corkhill nor defendant Scott agreed to build a new retaining wall with terraces as depicted on Plaintiffs' Exhibit #1A, pp. 2-4.
"It is a basic principal of contract law that in order to form a binding contract there must be an offer and acceptance based on a mutual understanding by the parties." Cavallo, etal v. Lewis, 1 Conn. App. 519, 520, 573 A.2d 338 (1984).
It is the plaintiffs' claim by their complaint that their Exhibit #1, with the attachment of Exhibit #1A, formed a contract between the parties fully integrating the terms of their mutual understanding and agreement.
The defendant Scott claims in the first instance that whatever the Corkhills agreed to do for the plaintiffs had his assent but, that he never saw the sketches represented by Exhibit #1A so could not have assented thereto and, therefore, the necessary mutuality of intent was lacking and the contract CT Page 4678 must fail insofar as he is concerned. Furthermore, no consideration flowed to defendant Scott as an individual.
If, aside from the question of consideration, Plaintiffs' Exhibit #1, with or without the attachment of 1A, is taken to be an offer from the parties signing same to do certain work for the plaintiffs in exchange for a grant of slope rights, then it is apparently the plaintiffs' claim that the plaintiffs' subsequent conveyance of the slope rights mentioned therein became an acceptance thereof and, therefore, binding on the defendants. The top of the document [Plaintiffs' Exhibit #1] states the obligors to be R. Woodrow Scott and Stephen Corkhill. However, it was not signed by Stephen Corkhill, but by the defendant William D. Corkhill after changing the printed signature below that line. Although the law seems to be that the court, in construing a contract will ignore obvious drafting errors, this document contains so many that it raises questions as to the intent of the parties thereto. When more than one meaning can be given language in a contract, the language is to be construed against the party who drew it. See Sturman v. Socha,191 Conn. 1, 9, 463 A.2d 527 (1983). That the document was prepared by Attorney Palm acting in behalf of the plaintiffs is clear from the testimony.
Generally, a written contract merges all prior and contemporaneous negotiations with reference to the same subject and is usually presumed to reflect their entire understanding. 17A Am.Jur.2d, Contracts § 397.
Both the plaintiffs and the defendant William D. Corkhill found the need to go outside the written document, in the case of the plaintiffs, to offer evidence of an additional oral promise, i.e. to build a retaining wall, and in the case of the defendant William D. Corkhill, to testify that some of the work promised in the writing was conditioned upon the driveway and its retaining walls being interfered with as a result of sloping along Lovers Lane.
The question, therefore, is, if all parties claim that the written document was not representative of their entire agreement, was there the requisite meeting of the minds to form a contract binding all the parties.
All defendants deny they agreed to perform the work CT Page 4679 depicted in the sketches as they were not in existence at the time the writing was signed and indeed bear the date of June 30, 1986, whereas, Plaintiffs' Exhibit #1 is dated June 26, 1986. The plaintiffs' claim is that the sketches merely add necessary details to the written promises and do not thereby alter its terms. The defendants' position, however, is that it adds considerably to the requirements of the written document in that terracing and facing of new walls is an unanticipated added requirement. Where a document referred to in a principal contract is not then in existence, the enforceability of the terms sought to be incorporated are placed in jeopardy. Housing Authority v. McKenzie,36 Conn. Sup. 515, 519 (1979).
Part of the plaintiffs' claim for damages sounds in trespass insofar as it alleges damages to their property in a variety of ways including the unauthorized removal of trees and topsoil and dumping of debris, as well as unauthorized grading of their land. Not a scintilla of evidence was offered to show any such damage was caused by defendant Scott or his corporation. In the absence of any evidence that those defendants committed a trespass, the court cannot draw any inference from a bare allegation of agency or joint venture as alleged in the complaint. In addition to a total lack of evidence that these defendants committed acts of trespass, the evidence is clear there was no relationship of agency or joint venture between defendant Scott or his corporation and defendant William D. Corkhill after title passed to him on July 23, 1986.
There was furthermore no dispute that defendant Scott never went near plaintiffs' land nor had any notice of any problems leading to this case from the latter date until he received a letter from plaintiffs' attorney in 1990.
As originally contemplated as shown on the proposed roadway drawings the slope angle required would be such as to accommodate a four-foot drop.
Sherman considered Lovers Lane and the contemplated Jean Drive, as originally laid out, to be dangerous traffic wise.
The subsequent decision by Town Engineer Thumb to raise the grade level as to Jean Drive in large measure addressed this concern and made the area safer. CT Page 4680
Sherman received a copy of Plaintiffs' Exhibit #1 signed by William Corkhill. Plaintiffs' Exhibit #1 recites, in part: "In consideration for signing" Grant of Slope Rights "dated June 26, 1986." Plaintiffs' Exhibit #2 the actual grant contains no obligations relative to doing anything on Sherman's land and merely indicates that the purpose of Plaintiffs' Exhibit #2 is to "permit construction of Jean Drive in accordance with the requirements of the Town of East Lyme to allow a reasonably graded slope to the southerly line thereof and to open the site line southerly along Lovers Lane."
No independent testimony was presented concerning the plaintiffs' claim of rubble being left on the plaintiffs' premises.
On more than one occasion, William D. Corkhill volunteered to install a privacy barrier of arborvitae on Sherman's premises along a portion of Jean Drive and plaintiffs refused to allow him or anyone acting under his direction to go upon the premises to do anything.
The retaining wall shown on Plaintiffs' Exhibit #10 and #11, the McKay Engineering drawings are not referenced on Plaintiffs' Exhibit #1 nor is there any writing incorporating the same in any alleged contract before the court.
Furthermore, the retaining wall shown on Plaintiffs' Exhibit #10 is on Town property and not premises owned by Sherman.
The Town of East Lyme is not a party to these proceedings. The Town of East Lyme, since the elevation change, has never required that any retaining wall be installed in the location shown of Plaintiffs' Exhibit #10.
George Sherman retired as a Senior Draftsman with Electric Boat on February 25, 1994.
Scott volunteered to install a 32 foot privacy barrier of arborvitae on Sherman's premises and Sherman's response was "Don't set foot on my property." Barbara Sherman confirmed in her testimony that Attorney Palm was Sherman's counsel. CT Page 4681
The plaintiffs, on the basis of the long list of exhibits representing estimates from various artisans or suppliers, claim $39,634.95 in damages and an additional claim of $45,314.64 in interest for a total of $84,939.59.
There was no contract because there was no meeting of the minds. The plaintiffs were represented by counsel in the creation of Plaintiff's Exhibit 1. The defendants were not represented by counsel as concerns the creation of Plaintiff's Exhibit 1.
By way of recapitulation, the court observes:
To form a valid and binding contract in Connecticut, there must be a mutual understanding on terms that are definite and certain between the parties. Ubysz v. DiPietro,185 Conn. 47, 51, 440 A.2d 830 (1981); Augeri v. C. F. WoodingCo., 173 Conn. 426, 429-30 (1977); Cavallo v. Lewis,1 Conn. App. 519 (1984).
To satisfy their burden of proving such a contract, the plaintiffs were required to establish by a preponderance of the evidence that there was an offer and acceptance, "each which must be found to have been based on an identical understanding by the parties". Bridgeport Pipe EngineeringCo. v. DeMatteo Const. Co., 159 Conn. 242, 249, 268 A.2d 391
(1970).
If the minds of the parties have not truly met no enforceable contract exists. Fortier v. Newington Group,Inc., 30 Conn. App. 505, 510, 620 A.2d 1321 (1993).
The failure of parties to agree to particular terms of a contract may evidence an intention not to be presently bound by certain discussions. J. Calamari J. Perillo, Contracts (2nd Ed. 1977) p. 51. "So long as any essential matters are left open for further consideration, the contract is not complete." 17A Am.Jur.2d, Contracts § 32 (1991).
The plaintiffs admittedly did grant the slope rights to Scotts Orchards, Inc. The slope rights were necessary to obtain planning and zoning approval although the subsequent change in highway grade level may have eliminated the necessity for the same. CT Page 4682
There being no contract, should equity then intervene in order that there be no unjust enrichment.
The photographic exhibits clearly show that the gradual slope and grade accomplished were done in a most professional manner, and the appearance of the property is pleasing.
William D. Corkhill tried on divers occasions to install an arborvitae sight barrier for Sherman, but his efforts were repulsed. For said arborvitae barrier, see Defendant's Exhibit 22.
 Equity. In its broadest and most general signification, this term denotes the spirit and the habit of fairness, justness, and right dealing which would regulate the intercourse of men with men, — the rule of doing to all others as we desire them to do to us; or, as it is expressed by Justinian, "to live honestly, to harm nobody, to render to every man his due." Inst. 1, 1, 3. It is therefore the synonym of natural right or justice. But in this sense its obligation is ethical rather than jural, and its discussion belongs to the sphere of morals. It is grounded in the precepts of the conscience, not in any sanction of positive law.
 In a restricted sense, the word denotes equal and impartial justice as between two persons whose rights or claims are in conflict; justice, that is, as ascertained by natural reason or ethical insight, but independent of the formulated body of law. Isabelle Properties v. Edelman, 297 N.Y.S. 572, 574, 164 Misc. 192.
Admittedly, there was testimony during the trial which went on for a number of days, offered without objection, that the defendants had tried to resolve and settle the dispute with the plaintiff and plaintiff's counsel.
That, however, cannot be held against the defendants as any man or woman is entitled to try and buy their peace to avoid the cost and uncertainty of litigation.
William D. Corkhill, the developer of the tract and the CT Page 4683 principal beneficiary of the granted slope rights in equity, should keep the verbal representation made admittedly long subsequent to Plaintiff's Exhibit 1 and provide the arborvitae screen as shown on Defendant's Exhibit 22, the cost for which as reflected on Defendant's Exhibit 21 was to the amount of $852.50.
The court acknowledges that William D. Corkhill had earlier attempted to accomplish this and was rebuffed by Sherman.
There was no joint enterprise between Scott and William D. Corkhill or Stephen Corkhill and these parties did not have a common financial interest in the subject tract of land.
Plaintiffs have not clearly established that they were ever shown the Jean Drive retaining wall plan reference being made to Plaintiff's Exhibits 10 and 11.
The fact that the stairs, retaining wall and driveway surface of the plaintiffs was in disrepair and unsafe may have been of concern to the plaintiffs, but their repair or replacement, unless damaged by William D. Corkhill, was never agreed to by William D. Corkhill or Scott.
The court has endeavored to carefully weigh all of the testimony adduced at the trial mindful of the conflicting positions of the parties.
The court closely observed each witness in considering the credibility of each.
Judgment may enter against the defendant William D. Corkhill in the amount of $852.50 only.
Austin, J.